IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEITH PHELPS,

                    Plaintiff,

        v.

ILLINOIS DEPARTMENT OF
CORRECTIONS, *et al.*,

               Defendants.

Case No. 22 C 932

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Keith Phelps ("Phelps") filed a Complaint against Defendants Illinois Department of Corrections ("IDOC"), and three of its employees — Mindi Nurse ("Nurse"), Rob Jeffreys ("Jeffreys"), and Catherine Larry ("Larry") — in their official and individual capacities, bringing Counts I, II, and III under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, against Defendant IDOC for sex discrimination, retaliation, hostile work environment, respectively; Count IV against all Defendants for violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; Count V against all Defendants for intentional infliction of emotional distress; and Count VI against all Defendants for violation of the Illinois Whistleblower Act ("IWA"), 740 ILCS 174, *et seq.* Defendants have moved to dismiss some of the counts as discussed herein pursuant

to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. No. 15.)  For the reasons stated herein, the Courts grants in part and denies in part the Motion.

## I.   BACKGROUND

In his Complaint, Plaintiff Phelps alleges the following facts.

### A.  Parties

The Illinois Department of Corrections ("IDOC" or "Institutional Defendant") operates the Joliet Correctional Treatment Center ("JCTC") (Compl. ¶ 3, Dkt. No. 1) and employs all other parties in this suit. (*Id.* ¶¶ 4-10.)

Mr. Keith Phelps ("Phelps") is an African American male, older than 40 years old at all times relevant to his Complaint. (*Id.* ¶¶ 2, 130.) Phelps began working at IDOC on December 11, 2017, as a Corrections Officer, and is currently employed there today. (*Id.* ¶ 10.) Phelps came to IDOC with 18 years of experience working with a department of corrections in a different state (*Id.* ¶ 10), as well as mental health trainings and certifications from that state. (*Id.* ¶ 15).

Mindi Nurse ("Nurse") directly supervised Phelps at the IDOC until her November 2021 transfer to another correctional center in Illinois. (*Id.* ¶ 6 & n.1)  From April 2018 until January 2020, Nurse worked as a Corrections Treatment Senior Security Supervisor

("CTSSS") at JCTC. (*Id.* n.1) She then assumed the role of Assistant Warden of Operations at JCTC, a position she held until her transfer. (*Id.*) Nurse presents as a white woman. (*Id.* ¶ 6.)

Defendant Rob Jeffreys ("Jeffreys") was employed as the Director of IDOC at all times relevant to this action. (*Id.* ¶ 4.)

Dr. Catherine Larry ("Larry") was employed as the Warden of JCTC at all times relevant to this action. (*Id.* ¶ 5.)

### B. Management Styles

Phelps prided himself on his "style of management that includes respect for inmates and treating them as human beings, in hopes that they reform and rehabilitate." (*Id.* ¶ 15) Although his fellow officers' safety was his primary concern when making decisions, Phelps believed that priority could be properly balanced with inmates' well-being and fair treatment. (*Id.* ¶ 16.) Phelps "ma[de] sure that residents are treated fairly and given every element of what they are entitled to regarding their safety, security, mental health treatment, and medical needs." (*Id.*) Inmates shared numerous positive reviews of Phelps's work. (*Id.*)

On or around March 16, 2019, Phelps was promoted to a Correctional Treatment Officer Supervisor ("CTOS"). (*Id.* ¶ 11.)

On or around April 11, 2019, at a meeting with Assistant Warden Godwin, Phelps, and other CTOSs and crews, Nurse accused Phelps of "staff splitting" and of being too respectful to inmates.

- 3 -

(*Id.* ¶¶ 12-13). She contended that the respect he showed inmates made his colleagues' jobs more difficult. (*Id.* ¶ 13.) Nurse instructed Phelps to "be more punitive and aggressive with the inmates of JCTC" and to "just say 'no' to [inmates'] issues or concerns." (*Id.*) With prompting from Nurse, the other CTOSs present agreed. (*Id.*)

Phelps communicated his refusal to adopt Nurse's philosophy, which Phelps understood as "more about punishment." (*Id.* ¶¶ 14-15.) He "fe[lt] that the meeting was an attack on his value system, work ethic, and the IDOC core values that he lives by while on the job." (*Id.* ¶ 14.) Indeed, Phelps had previously found himself at odds with his colleagues who favored the penal-based approach espoused by Nurse. (*Id.* ¶ 15.)

### C. Work Environment

Phelps believed Nurse and her associates made him feel like he should quit, skipped over him for promotions, and harassed and undermined him because of their conflicting approaches to inmate management. (*Id.*) For instance, Nurse frequently watched Phelps on camera to keep a "close eye" on him. (*Id.* ¶ 17.)

In August 2019, Nurse denied Phelps the mental health crisis training that he requested. (*Id.* ¶ 18.) Nurse explained that she was too busy to train Phelps, but around the same time, Nurse provided training to Phelps' colleagues, including Elizabeth Vera

("Vera"), who maintained a lower rank than Phelps. (*Id.* ¶¶ 18-20.) Vera mocked Phelps in front of others. (*Id.* ¶ 18.) Phelps made subsequent requests for training that Nurse denied. (*Id.* ¶ 19-20.)

In the Fall of 2019, Phelps and an investigator overheard Nurse and CTOS Allen in then - Warden Andrea Tack's office "conspiring" to place Phelps under IDOC investigation. (*Id.* ¶ 21.) Phelps heard them plan to fabricate a story, which "an inmate who was known to be racist" would corroborate, that Phelps had mistreated this particular inmate. (*Id.*) It was common knowledge in the facility that this inmate harbored distain for Phelps because of Phelps' African American race. (*Id.*) Upon hearing this plan, Phelps walked into the office and said something to the effect of, "I'm right here, are you serious? This isn't right," (*id.* ¶ 22.), which led Nurse to immediately walk out of the room "with a ghostly white face." (*Id.*) In January 2020, Phelps filed a complaint against Nurse to Larry, alleging discrimination and harassment. (*Id.* ¶ 24.) Shortly after, Phelps was denied a promotion for Temporary Assignment ("T.A.") as a Corrections Treatment Senior Security Shift Supervisor ("CTSSS") despite Phelps's eligibility due to his seniority. (*Id.* ¶ 25.) Nurse was on the board charged with making this decision. (*Id.*) By the time Phelps received his first T.A. to the CTSSS position, he had

applied over eight times, six of which occurred prior to his January 2020 denial. (*Id.*)

On April 1, 2020, Phelps emailed Warden Larry, alleging harassment, bias, discrimination, the spreading of lies, rumors, false reports, and innuendo; expressing his feelings of alienation; and relaying his concerns of having no support and ethical attacks against him in the workplace. (*Id.* ¶ 26.) In his email, Phelps requested a private meeting with Larry to discuss his concerns and any opportunity to a transfer to the Elgin facility. (*See* April 1, 2020, Email, Compl. Exhibit A, Dkt. No. 1.)

On or about May 20, 2020, Nurse orally reprimanded Phelps for the false accusation that Phelps had failed to pack and inventory the property of an inmate who was taking a temporary absence. (Compl. ¶ 27.) In June 2020, Phelps wrote an incident report in his defense and submitted it to Warden Larry. (*Id.*)

On or about June 6, 2020, Phelps filed a grievance related to a May 31, 2020, event in which a resident was not given their property back, and Phelps accused Nurse of treating White CTOSs differently than African American CTOSs. (*Id.* ¶ 28.)

On or about June 12, 2020, Phelps sent an email to Julie Anderson, ("Anderson"), a Human Resources employee at JCTC and a known associate of Nurse. (*Id.* ¶¶ 29, 98). Phelps carbon copied Larry on this email regarding Phelps' two (2) absences on May 23

and 24, 2021. (*Id.* ¶ 29.) Phelps turned in an electronic doctor's note for the missed days, but Anderson claimed the note was a fake. (*Id.*)

In July 2020, while Phelps was working as the CTOSs on duty, Nurse authorized a CTOS to spray an inmate, who was having a mental and emotional breakdown, in the face with OC (pepper spray). (*Id.* ¶ 30.) According to JCTC policies, Phelps should have been consulted before this spray, but he was not. (*Id.* ¶¶ 30-31.) Phelps told Nurse that he did not feel comfortable writing a report about a matter that was kept from him and for conduct that he would never authorize. As a result, Nurse told Phelps that he did not have to write the report, and instead "could go home." (*Id.* ¶ 32.)

On July 31, 2020, Phelps attempted to apply for a CTSSS Position. (*Id.* ¶ 33.) Phelps' qualifications, according to the qualifying factors for position, should have guaranteed Phelps an interview. However, around September 20, 2020, Phelps discovered that Anderson had failed to submit Phelps' application to IDOC. (*Id.* ¶ 33-34.) By the time IDOC finally received his application, interviews had already been scheduled. (*Id.* ¶ 37.) Phelps believed that Anderson had deliberately failed to submit Phelps' applications, because Anderson had submitted applications for other coworkers that were close associates of Nurse. (*Id.*)

In September 2020, Phelps saved an inmate from committing suicide. (*Id.* ¶ 38.) Afterwards, Nurse told Phelps something to the effect of, "here at JTC, we do not stop or attempt to stop residents from self-harming and committing suicide by opening the door to check on them if you cannot observe the resident by window or food port." (*Id.*)

For around four months starting in approximately September 2020, while Phelps was working as a CTSSS, neither Anderson nor Nurse notified Phelps of the requirement that he had to submit an overtime slip to Nurse. (*Id.* ¶ 39.) Instead, Nurse had given Phelps incomplete information. (*Id.*) When Phelps finally learned of the proper procedure from his colleagues, Phelps alerted Anderson that he had been underpaid. (*Id.*) Anderson responded that too much time had elapsed to approve pay for the past work. (*Id.* ¶ 40.) As a result, Phelps did not collect his overtime pay for his work during this time. (*Id.* ¶¶ 39-40.)

On or around October of 2020 Phelps broke his toe falling down the stairs at work. (*Id.* ¶ 41.) Phelps wrote an incident report on the injury and gave it to Nurse. (*Id.*) Phelps' doctor approved Phelps to work with a walking boot, (*id.* ¶ 42.), which contained no object that residents could use as a weapon. (*Id.* ¶ 43.) Anderson denied Phelps' ability to work with the boot, even though one of his female coworkers had been allowed to work in a

boot around the same time. (*Id.* ¶¶ 42-43.) Phelps then considered filing a workers compensation claim, but Nurse refused to offer the incident report required for the claim. (*Id.* ¶ 44.) Thus, Phelps could not recover on that account. (*Id.*)

One night, in or around December 2020, one of Phelps' coworkers, CTOS Oliver, put feminine hygiene menstrual pads in Phelps' locker, and though it amused his coworkers, Phelps felt humiliated. *(Id.* ¶ 45.)

On or about December 5, 2020, an IDOC human resource specialist informed Phelps that his grade was rejected by CMS for a CTSSS position in Concordia. (*Id.* ¶ 46.)

Sometime between December 2020 and February 2021, when Phelps managed first and second shift, CTSSS Brown and CTSSS Crudup (associates of Nurse) made Phelps' management more difficult by sending incomplete shift rosters. Brown and Crudup's failure to provide complete rosters resulted in unnecessary paperwork for Phelps and tardiness to his responsibility of sending writs. (*Id.* ¶ 47.) Nurse reacted by telling Phelps, "[y]ou better get that f***ing writ out!" (*Id.*)

For two (2) months starting in February 2021, Phelps ran the third shift by himself, despite repeatedly asking for assistance, which Nurse denied. (*Id.* ¶ 48.)

Nurse denied training to Phelps for years on the Glock pistol (*Id.* ¶ 49), D.O.A. (*Id.* ¶ 50), and roster management (*Id.* ¶ 51).

In February 2021, Phelps asked Nurse why she repeatedly denied his requests for training. (*Id.* ¶ 52.) Nurse responded that she opposed "men managing everything." Nurse told Phelps something to the effect of "since you men want to manage the facility, you can prep your own rosters [without her help or further training]." (*Id.*) Shortly after that discussion, one of Phelps' male coworkers, CTOS Richardson, resigned from JCTC due to the ignorance and constant harassment by Nurse. (*Id.* ¶ 53.)

Also in February 2021, Nurse yelled false accusations that Phelps had mandated that "officers [stay] late and of unjustifiably moving officers from their assigned post on the master roster." (*Id.* ¶ 54.) Phelps told Nurse that he moved officers to prevent burn-out and to keep up officer morale after he received complaints that many officers felt burnt out in JCTC Dorm 7 and 8, and that they did not feel safe down there. (*Id.*)

However, Nurse continued yelling until she was escorted out of the office by another CTOS. (*Id.* ¶ 55.) As this other CTOS escorted Nurse out of the office, they told Nurse that "Phelps does a good job on night shift," to which Nurse responded, "I am not going to talk you!" [*sic.*] Nurse later called Phelps to apologize to him after her outburst. (*Id.*)

- 10 -

Sometime between December 2020 and February 2021, Nurse told Phelps that since Phelps was "a man and wanted to manage" the JCTC facility as a CTSSS, she would not provide him the tools he needed to do his job as a senior shift supervisor. (*Id.* ¶ 56.) Despite JCTC policy that requires that a senior shift supervisor prep at least 48 hours prior to the designated shift, Nurse did not prepare rosters on time for Phelps, and did not give him access to prepare and print his own rosters. (*Id.* ¶¶ 56-57.) As a result, Phelps would be forced to stay over two (2) to three (3) hours to complete the preparation for the next shift. On multiple occasions when Phelps asked where the rosters were, Nurse or her associate blamed Phelps for losing them. (*Id.* ¶¶ 57-58.)

Between December 2020 and February 2021, Nurse forbade Phelps from attending mandatory senior shift supervisor meetings, where supervisors obtained the latest information pertaining to the operation of the JCTC facility. (*Id.* ¶ 59.) Missing these meetings made it difficult for Phelps to manage his shift. (*Id.*)

On March 10, 2021, Nurse assigned Phelps menial tasks such as cleaning out closets in Dorm 7. (*Id.* ¶ 60.) That night, while Phelps was on a phone call in the supervisor office, CTSSS Crudup interrupted him to yell and curse at him, demanding in an hour a report on a hunger strike that Phelps volunteered to write after another CTSSS had failed to do so. (*Id.* ¶ 61.) Phelps stopped what

- 11 -

he was doing and completed the report in the timeframe. (*Id.*) After that, CTSSS Crudup went back to her office and called Nurse to complain about the situation, "menacingly posturing" towards Phelps while she slammed objects on her desk, floor, and walls. (*Id.* ¶ 62.)

The following day, on March 11, 2021, Nurse denied Phelps the opportunity to complete a recent CTSSS assignment, which trains CTOSs to manage a shift and to complete noted shift documentation such as rosters, payroll sheets, overtime and hiring equilibrium programs. (*Id.* ¶ 63.) When Phelps asked Nurse why she denied him the opportunity, she fabricated an excuse. (*Id.* ¶ 64.) When Phelps asked Nurse for this statement in writing, Nurse claimed that she had a right to take away the job without cause. (*Id.*) Phelps argued that the Administrative Directive did not authorize this. (*Id.*) After the conversation, Phelps felt dizzy and weak, so he headed to the emergency room. (*Id.* ¶ 65.) As he was en route, Nurse called Phelps, demanding that he bring a doctor's note upon his return to work. (*Id.*). Phelps perceived the call and demand to be harassing. (*Id.*)

On March 11, 2021, Nurse falsely accused Phelps of failing to serve a written reprimand to CTOS Wilson. (*Id.* ¶ 66.) And even though CTOS Wilson had recently been reprimanded, Nurse gave CTOS

Wilson the CTSSS assignment that Nurse had just denied Phelps. (*Id.*)

In March 2021, Phelps learned that Nurse instructed other CTOS supervisors try to convince officers to write slanderous misleading information about Phelps in an effort to pack his personnel file with false allegations. (*Id.* ¶ 67.)

### D. Leave and Overtime

On April 8, 2021, Phelps took a non-service disability leave of absence, and was out of work between March 11, 2021, and May 1, 2021. (*Id.* ¶ 69.) During this time, on or about April 14, 2021, Nurse told Officer Catala to call Phelps and tell him that he missed two days of work (April 11, 2021, and April 14, 2021) — despite Phelps being on leave. (*Id.* ¶ 69.) While Phelps was on leave, Anderson further required Phelps to call in every day for three weeks to let her know that he was not coming into work. (*Id.* ¶ 70.)

Around May 24, 2021, Phelps attempted to take benefit time for personal family matters. (*Id.* ¶ 71.) However, Officer Brda in JTCT's payroll department explained that Larry denied it with the understanding that Phelps was still on FMLA medical leave. (*Id.*) Anderson should have known that Phelps's FMLA leave expired on May 1, 2021, and that he would have been permitted to take personal benefit time off. (*Id.*)

From around March 2021 through May 2021, Nurse refused to submit Phelps' overtime slips. (*Id.* ¶ 73.) Phelps noticed that the slips would disappear, or that he was not paid for his overtime work completed in earlier months, totaling $4,000 worth. (*Id.*) On May 31, 2021, when Phelps confronted Nurse about this, Nurse claimed she did not know where these overtime slips were and did not have them, adding that maybe the slips were in Phelps' mailbox. (*Id.* ¶ 74.) On May 30, 2021, no overtime slips had been in his mailbox. (*Id.* ¶ 75.) However, after Nurse's comment, the slips were discovered in his mailbox that day. (*Id.*) The slips were not signed, and when Phelps asked Nurse why that was the case, Nurse responded that she could not sign slips older than five days. Thus, Phelps did not receive payment for that overtime. (*Id.*)

### E. Complaints

On May 31, 2021, Phelps sent an email to the Confidential Assistant to IDOC Director Rob Jeffreys, detailing Phelps' allegations of retaliation, hostile work environment, and discrimination up to that point, and asking for the opportunity to be transferred to the Elgin treatment center. (See May 31, 2021, Email, Compl. Exhibit B, Dkt. No. 1; *see also* Compl. ¶ 72.)

On or about June 1, 2021, Phelps reported Nurse to IDOC. (*Id.* ¶ 77.) On or about June 2, 2021, IDOC's assistant deputy chief legal counsel and ethics officer sent an email to Phelps with

guidance to file a complaint with the Office of Executive General in the Department of Human Services, noting that she had filed the complaint for him on June 1, 2021. (See *id.* ¶ 78; June 2, 2021, Email, Compl. Exhibit C.) On or about July 9, 2021, the Deputy Inspector General for the Office of the Executive Inspector General ("OEIG") for the Agencies of the Illinois Governor, sent Phelps a letter stating that his complaint was referred to IDOC's Office of Affirmative Action. (*See* July 9, 2021, Email, Compl. Exhibit D, Dkt. No. 1.)

On or about August 16, 2021, Phelps filed a claim with the Equal Employment Opportunity Commission ("EEOC"), detailing the discriminatory acts by Nurse and others at JCTC, as EEOC Claim No.: 440-2021-03662. (*See* Charge of Discrimination, Compl. Exhibit E, Dkt. No. 1.)

On January 21, 2022, Phelps was reassigned to his previous shift of 3:00 PM — 11:00 PM ("second shift"), effective February 10, 2022, by CTSSS Jonathan Brown pursuant to directions of Warden Larry. (*See* Memorandum of Reassignment, Compl. Exhibit F, Dkt. No. 1.) This reassignment came as Phelps' claims for discrimination, hostile work environment, and whistleblower protection were still under investigation by Affirmative Action Department of the IDOC. (Compl. ¶ 81.)

On or about November 22, 2021, Phelps received his Right to Sue Letter from the EEOC. (*See* Notice of Right to Sue, Compl. Exhibit G, Dkt. No. 1.)

On or about February 11, 2022, Phelps filed an official grievance with the American Federation of State, County, and Municipal Employees ("AFSCME") regarding his reassignment back to the second shift. (Compl. ¶ 83.) In his grievance, Phelps expressed his desire to be "placed back on [third] shift permanently or to be transferred to Elgin Treatment Center" for his "mental, emotional, and physical well-being." (*Id.*)

Phelps timely filed this Verified Complaint within 90 days receipt of the Right to Sue letter pursuant to 42 U.S.C. § 2000(e)-5(f)(1). (*Id.* ¶ 84.)

In this suit, Phelps brings six counts of employment discrimination. He brings Counts I-III under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, against Defendant IDOC for sex discrimination, retaliation, hostile work environment, respectively. (Compl. ¶¶ 17-23.) Count IV is brought against all Defendants for violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (*Id.* ¶¶ 23-24.) Count V is brought against all Defendants for intentional infliction of emotional distress. (*Id.* at 24-25.) Count VI is brought against all Defendants for violation of the

Illinois Whistleblower Act ("IWA"), 740 ILCS 174, *et seq.* (*Id.* ¶¶ 25-26.)

## II.   LEGAL STANDARD

Rule 12(b)(1) is the proper vehicle to adjudicate sovereign immunity. *See Titus v. Ill. Dep't of Transp.,* 828 F.Supp. 2d 957, 965 (N.D. Ill. 2011). "[T]he party asserting jurisdiction bears the burden of proof." *Id.* (citing *Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 913 (7th Cir. 2009)).

To survive dismissal on a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). The plausibility standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). Though a complaint need not give "detailed factual allegations," it cannot merely provide "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 545.

When evaluating a motion to dismiss Rules 12(b)(1) and 12(b)(6), the Court draws all reasonable inferences in the plaintiff's favor and accepts as true all well-pleaded allegations. *Titus,* 828 F.Supp. 2d at 965 (citing *Long v. Shorebank*

*Dev. Corp.,* 182 F.3d 548, 554 (7th Cir. 1999)). Dismissal is appropriate "when it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Parungao v. Comty. Health Sys., Inc.,* 858 F.3d 452, 457 (7th Cir. 2017) (cleaned up).

### III. <u>DISCUSSION</u>

#### A. Jurisdiction

The Court first considers whether it maintains supplemental jurisdiction over Plaintiff's state law claims, and then turns to the issue of sovereign immunity under the Eleventh Amendment when it is raised by Defendants. A federal district court has supplemental jurisdiction over any claim that is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). "Congress enacted § 1367 to codify long-standing principles of pendent and ancillary jurisdiction, whereby federal courts may exercise supplemental jurisdiction over a state claim if the state and federal claims derive from a common nucleus of operative fact." *Hansen v. Bd. of Trs of Hamilton Se. Sch. Corp.,* 551 F.3d 599, 607 (7th Cir. 2008) (citing *City of Chi. v. Int'l Coll. of Surgeons,* 522 U.S. 156, 164-65 (1997) and *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966)).

Even if the Court finds supplemental jurisdiction, "a defendant invoking [the Eleventh Amendment's] sovereign immunity deprives a federal court of jurisdiction over the claims against that defendant." *McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 533 (7th Cir. 2022) (citing *FEC v. Cruz*, 142 S.Ct. 1638, 1646 (2022)).

Here, neither party disputes that the federal and state claims against all Defendants form part of the same case or controversy. All claims arose out of the same facts: Phelps's treatment by his supervisors and colleagues at IDOC. Defendants invoke sovereign immunity defenses in their Counts VI and V. The Court herein evaluates those arguments and others under the respective counts in which Defendant raised them. Because the Court maintains supplemental jurisdiction over these claims, it will assess whether sovereign immunity applies according to each claim for which the defense was raised.

### B. Counts I, II, III, IV:  2020 Promotion Denials

Defendants do not seek to dismiss Plaintiff's four counts of discrimination in their entirety but instead to limit from consideration certain incidents, namely, Phelps's promotion denials in January 2020 and September 2020.

Defendants argue that Plaintiff's discrimination claims against IDOC should be dismissed to the extent he contends he was

denied promotions in January 2020 and September 2020 because Plaintiff did not file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discrimination.

Plaintiff argues that the continuing violation doctrine renders these two incidents actionable. This doctrine "allows a court to consider as timely all discriminatory conduct relevant to a claim, so long as there is sufficient evidence of a pattern or policy of discrimination." *Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 690 (7th Cir. 2001) (cleaned up).

Courts in this district consider it "well settled," however, that "an employer's failure to promote an employee is a discrete act not subject to the continuing violation doctrine." *Carter v. Dart,* 262 F.Supp. 3d 713, 720 (N.D. Ill. 2017) (citing *e.g., Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 860 (7th Cir. 2005) ("[D]iscrete discriminatory employment actions such as termination, failure to promote, denial of a transfer, or refusal to hire are deemed to have been taken on the date they occurred, even if they form part of an ongoing practice or are connected with other acts.")); *see also National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002). Instead, "a plaintiff raising claims of discrete discriminatory or retaliatory acts must file

his charge within the appropriate time period." *Morgan,* 536 U.S. at 122 (2002).

A plaintiff must file his charge of employment discrimination within 300 days of the alleged unlawful employment practice. *Moore v. Vital Prods.,* 641 F.3d 253, 256 (7th Cir. 2011). Here, Plaintiff filed his EEOC charge on August 16, 2021, more than 300 days after both instances of alleged conduct.

It follows that Phelps cannot base his discrimination claims on the denial of his promotions in January 2020 or September 2020.

### C. Count IV: ADEA

Defendants argue that Plaintiff's ADEA claim against Defendants Jeffreys, Larry, and Nurse should be dismissed because the ADEA does not afford recovery through an individual liability theory." Defendants invoke long-held precedent dictating that "there is no individual liability under the ADEA." *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37,* 260 F.3d 602, 610 n.2 (7th Cir. 2001); *see also, e.g., Cheng v. Benson,* 358 F.Supp. 2d 696, 700 (N.D. Ill. 2005) (dismissing an employee's complaint under the ADEA against his individual supervisor).

Plaintiff argues that the Supreme Court's decision in *Mt. Lemmon Fire Dist. v. Guido,* 139 S.Ct. 22 (2018), effectively overruled *Horwitz* and decades of precedent in this circuit that does not recognize individual liability under the ADEA.

- 21 -

Plaintiff's attorney brought this very argument to another judge
in this district who rejected it. *See Cullotta v. United Surgical
Partners Int'l, Inc.,* No. 19-CV-06490, 2021 WL 3367193, at *10
(N.D. Ill. 2021). So, too, does this Court today.

Accordingly, Defendants Nurse, Larry, and Jeffreys, as
individuals, are improper parties to Plaintiff's ADEA claim.
Phelps's ADEA claims in Count IV against Defendants Jeffreys,
Larry, and Nurse are dismissed.

### D. Count VI:  IWA

Defendants set forth four arguments in hopes of dismissing
Phelps's claims under the Illinois Whistleblower Act ("IWA"), 740
ILCS 174, *et seq.,* for retaliation. Specifically, Defendants argue
that (1) the Institutional Defendant IDOC is out of IWA's reach
because education is not a major function of IDOC; (2) all
Defendants are protected from suit by sovereign immunity; (3) the
individual Defendants, operating as agents of an employing
institution, cannot be "employers" under IWA; and (4) Plaintiff
has failed to state a claim under the IWA against Defendants Larry
and Jeffreys.

#### 1. *Institutional Defendants*

Defendants argue that the Institutional Defendant IDOC cannot
be reached by the IWA because it is not a "State agency whose major
function is providing educational services." 740 ILCS 174/5.

- 22 -

Specifically, Defendants argue that "the mere fact that IDOC offers education resources to incarcerated individuals does not support a plausible inference that the 'major function' of IDOC is to provide educational services." (Reply, Dkt No. 24 at 8.) Defendants appear to conflate mistakenly a "major function" with the primary function.

The Illinois corrections system appears to understand that education is fundamental to the corrections process. For instance, IDOC's "juvenile and adult divisions provide full ranges of educational services from basic literacy through high school completion" and "[s]ome facilities also offer college-level academic courses." *People v. Martin,* 674 N.E.2d 90, 94 (Ill. App. 1st Dist. 1996). Moreover, "[e]very facility also offers some form of special education services, career counseling and vocational training." *Id.* Likewise, the federal corrections system incorporates education. *See Mistretta v. United States,* 488 U.S. 361, 367 (1989) (noting that Congress made clear with the Sentencing Reform Act of 1984, 18 U.S.C. § 3553, that "punishment should serve retributive, *educational*, deterrent, and incapacitative goals") (emphasis added); *see also* 18 U.S.C. § 3553 (a)(2)(D) (codifying that judges should consider the need to "provide the defendant with needed educational or vocational training" when imposing criminal sentences).

Neither party cites precedent definitively clarifying the IWA's applicability to IDOC regarding its educational function. Left with a question better suited for a trier of fact, this Court declines to adopt Defendants' suggestion that education is, by definition, not a major function of Illinois's corrections system. The Court declines to dismiss this count on this ground.

That said, the Court questions the relevance of this inquiry. Since its enactment, the IWA has ushered an array of defendants towards accountability by enabling employees to refuse "to engage in unlawful conduct by their employers." *Young v. Alden Gardens of Waterford, LLC,* 30 N.E.3d 631, 654 (Ill. App. Ct. 2015). Courts have observed that the IWA's employer definition delineated educational roles to clarify for prospective whistleblowers that, in order to receive protection under the Act, they must report alleged violations outside of their employer. *See Smith v. Madison Mut. Ins. Co.,* No. 05-CV-00142-DRH, 2005 U.S. Dist. LEXIS 12760, at *4 (S.D. Ill. June 21, 2005) (noting that the IWA does not protect an employee who disclosed information to their own company). In any event, the Court does not find that the IWA itself forecloses suit against IDOC.

The Court must, however, dismiss the count against the state agency IDOC on grounds of sovereign immunity. *See Murphy v. Smith,* 844 F.3d 653, 659 (7th Cir. 2016), *aff'd,* 138 S.Ct. 784 (2018)

("The Illinois sovereign immunity statute protects the State against being made a defendant or party in any court.") (internal quotations omitted); *Harris v. Illinois,* 753 F.Supp. 2d 734, 742 (N.D. Ill. 2010) ("[T]he Whistleblower Act is not specifically mentioned as an exception to the State's immunity from suit in the Immunity Act nor is there any indication that the Illinois legislature intended to waive the State's sovereign immunity when expanding the Whistleblower Act's definition of employer.").

### 2. *Individual Defendants*

While sovereign immunity exists for charges against IDOC, sovereign immunity does not exist for charges against the *individual* Defendants under the Illinois Whistleblower Act. The doctrine of sovereign immunity "affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law *or* in excess of his authority." *Richman v. Sheahan,* 270 F.3d 430, 441 (7th Cir. 2001) (emphasis added) (quoting *Healy v. Vaupel,* 549 N.E.2d 1240, 1247 (Ill. 1990); *see also Murphy,* 844 F.3d at 659; *Leetaru v. Bd. of Trs. of Univ. of Ill.*, 32 N.E.3d 583, 595 (Ill. 2015). Also known as the "officer suit" exception, when an officer of the State commits an unconstitutional act or violates a statute, this doctrine stipulates that the suit is not against the State itself, "because the State is presumed not to violate its own constitution or

enactments." *Turpin v. Koropchak,* 567 F.3d 880, 884 (7th Cir. 2009) (citing *PHL, Inc. v. Pullman Bank & Trust Co.,* N.E.2d 351, 357 (Ill. 2005).

Defendants next argue that the Court should dismiss Count VI against the individual Defendants because the IWA only provides for claims by an "employee" against an "employer," not claims against the employer's agents. The Court is not convinced by this reasoning.

Under the IWA, an "employer" is:

an individual, sole proprietorship, partnership, firm, corporation, association, and any other entity that has one or more employees in this State, including a political subdivision of the State; a unit of local government; a school district, combination of school districts, or governing body of a joint agreement of any type formed by two or more school districts; a community college district, State college or university, or any State agency whose major function is providing educational services; any authority including a department, division, bureau, board, commission, or other agency of these entities; and any person acting within the scope of his or her authority express or implied on behalf of those entities in dealing with its employees.

740 ILCS 174/5. While Courts within this district remain split regarding whether individuals are subject to liability under the IWA, *see Wheeler v. Piazza,* 364 F.Supp. 3d 870, 884 (N.D. Ill. 2019) (collecting cases), this Court is persuaded by the findings of other courts in this district that the IWA applies to individual agents. *See id.*

- 26 -

Thus, because the Court finds that neither the IWA itself nor the doctrine of sovereign immunity bar claims against individual defendants for IWA violations, this count remains as to the individual Defendants.

### 3.  Stating a Claim

Now that the Court has arrived at the legal ability of Phelps to bring a claim, it turns to whether he actually has done so.

To state a claim under the IWA, an employee must allege: "(1) an adverse employment action by his or her employer, (2) which was in retaliation, (3) for the employee's disclosure to a government or law enforcement agency, (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Smith v. Bd. of Educ.,* No. 20-cv-03069, 2021 WL 4459529, *7-8 (N.D. Ill. 2021) (citing *Sweeney v. City of Decatur*, 70 N.E.3d. 184, 188 (Ill. App. Ct. 2017)).

Phelps has satisfactorily pled the third and fourth prongs of an IWA claim by alleging that on August 16, 2021, he filed with the EEOC (a government agency) a charge alleging discrimination (in violation of federal and Illinois law).

Defendants argue that Phelps failed to allege that he suffered an adverse employment action by either Defendant Jeffreys or Defendant Larry and, as such, has failed to state a claim against these Defendants under the IWA. Plaintiff alleges that Larry

reassigned him to a different shift on January 21, 2022. But according to Defendants, who cite *Place v. Abbott Lab., Inc.,* 215 F.3d 803, 810 (7th Cir. 2000), a lateral transfer without a loss in benefits does not constitute an adverse employment action.

Defendants are incorrect. An adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, (2006) (citation omitted)). "A lateral job transfer within an organization may constitute an adverse employment action, for example, if it reduces the employee's 'opportunities for future advancement.'" *O'Neal v. City of Chicago,* 588 F.3d 406, 409 (7th Cir. 2009) (quoting *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 781 (7th Cir. 2007)).

Whether Phelps's lateral transfer on January 21, 2022, constituted an adverse employment action is a factual question ripe for discovery. So, too, is whether the purpose of the transfer was retaliatory. The allegations of Phelps's preferences for third shift, the timing of the transfer within months of his EEOC filing, the pervasive animus, and IDOC's culture of indirect communication make both findings plausible.

Defendants next argue that Phelps has failed to allege that Jeffreys was involved in retaliatory conduct. Specifically, Defendants assert that Plaintiff's allegations that he sent an

email complaining of discrimination to an assistant at IDOC rather than Jeffreys himself, fail to plausibly suggest that Jeffreys was aware of Phelps's complaints or that he later engaged in any retaliatory conduct.

However, drawing all reasonable inferences from the alleged facts, it is indeed plausible that Jeffreys may have been notified of Phelps' discrimination allegations after his "Confidential Assistant" received Phelps' email on May 31, 2021. And more importantly, as Director of IDOC, Jeffreys would have plausibly been made aware that Phelps's filed an EEOC charge alleging similar discrimination charges on August 16, 2021. While discovery can elucidate what happened, Phelps adequately alleged Jeffreys' involvement at this stage of proceedings.

The Court grants Defendants' Motion to Dismiss the IWA count as to IDOC and denies Defendants' Motion to Dismiss the IWA count as to the individual defendants.

The Court notes that it drew all reasonable inferences and viewed the facts in the Plaintiff's favor to find the plausibility that the Defendants were acting in their individual capacities, but more facts establishing individual capacities are needed to prevail such claims.

### E. Count V: IIED

Defendants argue that Plaintiff's claims in Count V of intentional infliction of emotional distress ("IIED") against all Defendants are barred by sovereign immunity.

In his response, Phelps argues that the state remains subject to suit under the 14th Amendment on account of his allegation that IDOC took away his liberty interest without due process. To allege properly a procedural due process claim based on the deprivation of a liberty interest, a plaintiff "must sufficiently allege (1) that [he] had a cognizable liberty interest under the Fourteenth Amendment; (2) that [he] was deprived of that liberty interest; (3) and that the deprivation was without due process." *Mann v. Vogel,* 707 F.3d 872, 877 (7th Cir. 2013). A deprivation of a protected 14th Amendment liberty interest occurs when "a right or status previously recognized by state law [is] distinctly altered or extinguished." *Paul v. Davis,* 424 U.S. 693, 711 (1976); *see also Hannemann v. S. Door Cnty. Sch. Dist.,* 673 F.3d 746, 753-55 (7th Cir. 2012).

Phelps did not charge a Fourteenth Amendment violation in his complaint. The Court need not consider counts first introduced in the responsive briefing. *See* FED. R. CIV. P. 12(b)(6). Still, the Court anticipates difficulty finding a deprivation of a cognizable

liberty interest in the facts alleged. *See Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972).

Thus, the Court is reviewing the state tort claim as it was brought in the complaint:  as a state tort claim.

### 1.  Institutional Defendants

Under Illinois law, the Illinois Court of Claims maintains exclusive jurisdiction over all claims against the state for damages in cases sounding in tort. 705 ILCS 505/8. Although the State of Illinois has waived Eleventh Amendment sovereign immunity for actions in tort in the Court of Claims, it has not done so for federal courts. *Feldman,* 171 F.3d at 498.

Here, Phelps's allegations against individual defendants that arise out of their alleged supervision of Phelps at IDOC are in their official capacity. Therefore, the acts committed in their official capacity are ultimately attributed to the state agency, IDOC. *See Patton,* 2022 WL 865835, at *3. Since IDOC maintains sovereign immunity in state tort claims, the Court must dismiss this count against IDOC and the individual defendants in their official capacity. The individual defendants maintain no such immunity. *See supra.*

### 2.  Individual Defendants Generally

Phelps brought his IIED count against all Defendants, which ostensibly includes Nurse, Larry and Jeffreys in their individual

capacities. To determine whether an act occurred in an official capacity, "The question to ask . . . is whether the defendant breached a duty owed by all citizens, or whether he breached a duty held uniquely by State employees holding the job at issue." *Turpin,* 567 F.3d at 883. Although there appears little dispute that the individual defendants were acting in their official capacity in many of the facts alleged, additional factual information is needed about the Defendants' roles and conduct in relation to Phelps. *See Harris v. City of Chicago,* 479 F.Supp. 3d 743, 753 (N.D. Ill. 2020).

### 3. *Stating a Claim*

Nevertheless, to plead a cause of action for intentional infliction of emotional distress, a plaintiff must allege facts to establish: "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." *Bianchi v. McQueen,* 58 N.E.3d 680, 699 (Ill. App. Ct. 2016) (citing *Kolegas v. Heftel Broad. Corp.,* 607 N.E.2d 201 (Ill. 1992).

Phelps has not successfully stated a claim for intentional infliction of emotional distress. The Court remains hard pressed to find facts that could satisfy any of these elements as to

Jeffreys or Larry. Although he likely pleads enough facts to meet the standard for extreme and outrageous behavior on the part of Defendant Nurse, he fails to show that her conduct caused him severe emotional distress.

In Illinois, "extreme and outrageous behavior requires conduct that goes beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage." *Duffy v. Orlan Brook Condo. Owners' Ass'n,* 981 N.E.2d 1069, 1079 (Ill. App. Ct. 1st Dist. 2012). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not constitute extreme and outrageous conduct for the purposes of an intentional infliction of emotional distress claim." *Taliani v. Resurreccion,* 115 N.E.3d 1245, 1254 (Ill. App. Ct. 3rd Dist. 2018) (citing *McGrath v. Fahey,* 533 N.E.2d 806, 809 (Ill. 1988)). Although courts are generally hesitant "to find a claim for intentional infliction of emotional distress in employment situations," *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. Ct. 1st Dist. 2000) (citing *Vickers v. Abbot Lab'ys,* 719 N.E.2d 1101, 1115 (Ill. App. Ct. 1st Dist. 1999)), "Illinois courts have found extreme and outrageous behavior to exist in the employer/employee context when the employer 'clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-

related stress caused by the average work environment.'" *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 605 (7th Cir. 2006) (quoting *Honaker v. Smith,* 256 F.3d 477, 491 (7th Cir. 2001)).

The court in *Naeem v. McKesson Drug Co.* ruled for the plaintiff in part because the defendant employer had "force[d] Ms. Naeem to climb up an unstable metal stairway to hook up computer equipment during her pregnancy; sabotage[ed] Ms. Naeem's computer to deny her access and alter her files; publicly criticiz[ed] Ms. Naeem's work during meetings with other supervisors; mov[ed] her office and her transportation files, causing her to be unable to locate necessary paperwork; and increase[ed] the amount of work due under the PIPS, knowing that Ms. Naeem would not be able to meet the deadlines." *Id.* at 606.

Here, Defendant Nurse forced Phelps to stay two to three hours after his shift by deliberately withholding rosters until the end of his shift, sabotaged his attempts to receive workers compensation by refusing to hand over the incident report, and conspired with a coworker to spread false allegations about Phelps mistreating an inmate, among other alarming actions. It is plausible that these actions meet, if not exceed, the abuse of power in *Naeem*.

Nevertheless, Phelps has not pled the severity element because he failed to allege sufficient "factual allegations from

- 34 -

which the level of severity could be inferred." *Welsh v. Commonwealth Edison Co.,* 713 N.E.2d 679, 684 (Ill. App. Ct. 1st Dist. 1999). He claims that he was, at one point, humiliated after menstrual pads were found in his locker; however, this incident was not perpetrated by any of the individual Defendants, and severity cannot be inferred by this fact alone when millions of people use this product in their daily life. Nevertheless, this brief description of humiliation is no more than a characterization of his distress, and Illinois courts have held that "[m]erely characterizing emotional distress as severe is not sufficient." *Id.* at 685. Phelps also describes going to the emergency room due to feeling dizzy and weak following an argument with Defendant Nurse regarding denial of an opportunity for him to complete a CTSSS Temporary Assignment. While hospitalization or need to seek medical care is sufficient to support an allegation of severe emotional distress, the plaintiff must show a clear and direct link between the defendant's conduct and the subsequent medical care received or injury suffered. *See Id.* at 684; *Milton v. Ill. Bell Tel. Co.,* 427 N.E.2d 829, 831 (Ill. App. Ct. 1st Dist. 1981). Phelps does not do so.

Defendant's Motion to Dismiss Count V is granted as to IDOC, Defendant Jeffry, and Defendant Larry and denied as to Defendant

Nurse in her individual capacity. These dismissals are without prejudice.

### IV.   CONCLUSION

For the reasons herein, Defendants' Motion to Dismiss (Dkt. No. 15) is granted in part and denied in part as follows:

1.   The Motion is granted insofar as Plaintiff is time-barred from basing discrimination claims in Counts I, II, III, and IV on his alleged promotion denials in 2020; Plaintiff may not bring his Count IV ADEA claim against individual defendant; the Court will not adjudicate Plaintiff's claims in Counts V and VI against IDOC and defendants in their official capacity; and the Court dismisses Count V against Larry and Jeffreys in their individual capacities.

2.   The motion is denied as to Count V against Nurse in her individual capacity and as to Count VI against Defendants Nurse, Larry, and Jeffreys in their individual capacities.

**IT IS SO ORDERED.**

_____
     Harry D. Leinenweber, Judge
     United States District Court

Dated: 6/15/2023

- 36 -